**William Jeremiah VREELAND, an infant by his Father and natural guardian, William Thomas Vreeland, Plaintiff,**

v.

**Louis CARDI, M.D., et al., Defendants.**

No. CV 98–2424.

United States District Court, E.D. New York.

March 19, 2000.

Fitzgerald & Fitzgerald, P.C. by John M. Daly, Yonkers, NY, for Plaintiff.

Vladek, Waldman, Elias & Engelhard, P.C. by Maureen M. Stampp, New York City, for Board of Trustees of the Road Carriers Local 707 Welfare Fund.

### MEMORANDUM AND ORDER

WEXLER, District Judge.

This is an action that was commenced in the Supreme Court of the State of New York, County of Suffolk (the "State Court Action") and later removed to this court. In the State Court Action, Plaintiff William Thomas Vreeland ("William Vreeland") sued on behalf of his minor child, William Jeremiah Vreeland, ("Billy Vreeland" or "Billy") for injuries sustained by

Billy at birth. The State Court Action was settled for approximately $1.9 million.

In March of 1998, William Vreeland moved, in the State Court, for an order setting the amount, if any, of his medical insurance company's lien on the proceeds of the settlement. Thereafter, the insurer (referred to herein as the "Fund"), citing the Employee Retirement Income Security Act ("ERISA") as a basis of federal jurisdiction, removed the action to this court. Presently before the court are the parties' cross-motions for summary judgment. For the reasons that follow, the motions are denied.

## BACKGROUND

### I. Factual Background

#### A. The Birth of Billy Vreeland

Maureen Vreeland, William Vreeland's wife and Billy Vreeland's mother, was admitted to the Community Hospital of Western Suffolk on October 27, 1986. At the time, she was thirty-one weeks pregnant. Two days later, Maureen Vreeland gave birth, prematurely, to Billy. Billy was born with immature lungs. After his birth, Billy was transferred to Stony Brook University Hospital, where he remained for 121 days. For twelve weeks of his stay, Billy was attached to a respirator. Since birth, Billy has been hospitalized on several occasions.

Because there is a dispute between the parties regarding the precise nature and cause of Billy's injuries, the court will not comment extensively on these issues—they are not necessary to the disposition of the instant motions. Suffice it to say, however, that Billy has suffered serious medical complications since his birth. He has been diagnosed with cerebral palsy and a variety of lung ailments.

#### B. The Payment of Billy's Medical Expenses

At all relevant times, William Vreeland has been an employee of Waldbaums. As such, he has been a participant in the Road Carriers Local 707 Welfare Fund (the "Fund"). The Fund reimburses medical expenses of its participants and their dependants. As dependants of William Vreeland, Maureen and Billy Vreeland are eligible for such payment. Since Billy's birth, the Fund has made various payments for his medical expenses. Those payments were associated with, *inter alia*, Billy's cerebral palsy as well as his lung disease.

#### C. The State Court Action

William Vreeland commenced the State Court Action in 1990. Named as defendants were Dr. Louis D. Cardi (Mrs. Vreeland's obstetrician), the Community Hospital of Western Suffolk (the hospital where Billy was born—the "Hospital"), Michael Cuccinello, a Registered Nurse Anesthesiologist and his employer, Community Anesthesia Services. Dr. Cardi was argued to be liable for failing to have Mrs. Vreeland transferred to a tertiary care hospital and failure to have a neonatologist present at the birth. The anesthesiologist and his employer were alleged to have improperly resuscitated and intubated the child.

The State Court Action was never tried. Instead, Plaintiff settled with defendants. First, Plaintiff settled with the Hospital for $10,000. Next, in 1998, Plaintiff settled with the nurse-anesthesiologist and his employer for $300,000. Finally, Plaintiff settled with Dr. Cardi for $1.6 million. Upon settling with the latter three defendants, the settling parties put a stipulation on the record stating, in pertinent part, that no part of the settlement was "intended to be for any part of medical expenses." Instead, it was stated to be the intention of

the parties that the settlement proceeds were intended to settle for "future specials and including loss of earnings and future pain and suffering."

### D. *The Fund's Participation in the State Court Action*

While the precise date is in dispute, it is clear that the Fund became aware of the State Court Action prior to the settlement. In 1993, while the State Court Action was pending, the Fund contacted William Vreeland and requested that he sign a subrogation agreement, assigning to the Fund all rights, to the extent of the amount paid by the Fund, that he had against any party that might be liable for Vreeland's loss.

The Vreelands inquired as to the extent of the amount claimed by the Fund as reimbursement for Billy's medical expenses. The precise amount claimed by the Fund prior to settlement of the State Court Action is the subject of a sharp and critical factual dispute. According to Plaintiff, the Fund never informed the Vreelands, prior to the settlement of the State Court Action, that they were claiming any amount in excess of $56,000. In this lawsuit, however, the Fund claims a right to reimbursement of over $316,000. The Fund disputes that it ever limited its claim in any way. Instead, the Fund faults the Vreelands for keeping the fund "out of the loop" of settlement discussions and therefore lays the blame for any misconception as to the amount sought with the Vreelands.

### E. *The Fund's Contractual Right to Reimbursement*

The Fund's right to reimbursement of expenditures for participant medical expenses is contained in the plan document governing the Fund (the "Plan"). The reimbursement and subrogation clause contained in the Plan states, in pertinent part:

> To avoid double payment [most insurers] require reimbursement of bills paid by the fund, if and when the participant recovers those same expenses from another person or organization. For example, if the fund paid your hospital, medical or similar expenses and you were to receive those same expenses by way of a law suit or a settlement from a third party or the third party's insurance company, then the fund would have the right to be reimbursed by the third party or their insurer in the amount of the expenses paid by the fund on your behalf.

### F. *The Parties' Cross–Motions*

The parties have cross-moved for summary judgment. The Fund claims that it is clear that the money received by Plaintiff in settlement of the State Court Action falls clearly within the reimbursement and subrogation provision of the Plan. Plaintiff opposes the Fund's motion and seeks summary judgment on his own behalf.

First, Plaintiff argues that the equitable doctrines of estoppel and laches bar the Fund's right to recovery in whole or in part. The estoppel argument urges that the Fund's recovery (if any) should be limited to the $56,000 claim that Plaintiff relied upon when settling the State Court Action. Plaintiff argues that laches bars the Fund's claim because of the Fund's undue delay in seeking reimbursement.

Plaintiff also opposes the Fund's claim to reimbursement on the merits. Relying on the Plan language which gives the Fund the right to recover "the same" expenses paid by the Fund, Plaintiff argues that the Fund cannot show that the settlement proceeds were paid in compensation for the "same" medical expenses paid by the Fund. Indeed, Plaintiff argues that sum-

mary judgment is proper because the settlement stipulation entered into in the State Court Action recites that the proceeds were not intended as compensation for medical expenses. Finally, Plaintiff argues that even if the Fund's right to the settlement proceeds is established, summary judgment is improper because the amount of the lien is a factual matter in dispute.

After outlining the applicable legal principles, the court will turn to the merits of the parties' motions.

## DISCUSSION

### I. Legal Principles

#### A. Basis for Federal Jurisdiction and Summary Judgment Standards

The Fund is an employee benefit plan and a multi-employer plan as defined by ERISA. This court has jurisdiction over the claim asserted by the Fund based upon Section 503(a)(3) of ERISA, which allows plan fiduciaries to bring suit to enforce the terms of an ERISA plan. 29 U.S.C. § 1132(a)(3).

The standards for granting summary judgment are familiar. Such motions are properly granted only where the moving party can establish the absence of issues of material fact and an entitlement to judgment as a matter of law. Fed.R.Civ.P. 56(c). Where the moving party establishes entitlement to relief, the non-moving party must establish the existence of a material issue of fact for trial to avoid summary judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

#### B. The Right to Reimbursement under ERISA

Various cases have established the right of an entity, such as the Fund, to reimbursement of medical expenses after a participant's settlement of a lawsuit stemming from injuries covered by the Fund. These cases focus not on any federal ERISA common law, but on subrogation language contained in the particular plan document at issue. For example, in *McIntosh v. Pacific Holding Co.*, 992 F.2d 882 (8th Cir.1993) and *Singleton v. Board of Trustees of IBEW Local 613*, 830 F.Supp. 630 (N.D.Ga.1993), relied upon heavily by the Fund, the courts ordered reimbursement of medical expenses paid by an insurer out of settlement proceeds. In both of those cases, the subrogation clauses of the relevant plan documents provided for a broad right of reimbursement out of settlement proceeds, whatever their allocation.

In *McIntosh*, the subrogation clause stated that the company would be reimbursed "to the extent of ... the amount or amounts received by the [insured] from [any individual] by way of settlement...." *McIntosh*, 992 F.2d at 883. The subrogation clause was similarly broad in *Singleton*. There, the insurer's subrogation clause provided for reimbursement "to the extent of, but not exceeding, the amount received by the individual ... by way of settlement...." *Singleton*, 830 F.Supp. at 632. Both *McIntosh* and *Singleton*, allowed reimbursement out of settlement proceeds, therefore, because of the unlimited scope of the subrogation clauses, providing for repayment of medical expenses from any amount received in settlement. *See also Chitkin v. Lincoln Nat'l. Ins. Co.*, 879 F.Supp. 841, 859 (S.D.Ca.1995) (requiring reimbursement from settlement proceeds where reimbursement clause required repayment of "any" amount received from a third party).

In *U.S. Healthcare, Inc. v. O'Brien*, 868 F.Supp. 607 (S.D.N.Y.1994), on the other hand, the terms of the relevant subrogation clause were held not to re-

quire reimbursement of medical expenses out of settlement proceeds. There, the plan document provided, *inter alia*, that the insurer had a right to reimbursement of medical expenses "only when the amount received by a member is: (i) for hospital, medical or surgical services; and (2) only to the extent that those services were provided by [the insurer]." *O'Brien*, 868 F.Supp. at 609.

In *O'Brien*, the insured's settlement with various defendants specifically allocated settlement proceeds to matters other than medical expenses. The court denied the insurer's request for reimbursement for payment of such expenses out of the settlement proceeds on the ground that the insurer had not established that the settlement proceeds fell within the language of the subrogation clause.

The court in *O'Brien* further rejected the notion that the insurer was entitled to recover as a matter of unjust enrichment. Reasoning that such a claim could succeed only to the extent that the insured received double payment for medical expenses the court, relying on the parties' allocation of the settlement, held that no such double payment could be established and that therefore, no claim of unjust enrichment could succeed. *Id.* at 614.

## II. *Disposition of the Motions*

As the above discussion makes clear, the resolution of this matter depends upon the interpretation of the reimbursement and subrogation clause contained in the Plan. To reiterate briefly, the Plan requires reimbursement when settlement proceeds are payment to the insured for "the same" medical expenses previously paid by the Fund. The plain and simple interpretation of this contractual provision requires the Fund to show that the settlement proceeds received by the Vreelands were meant to compensate for "the same" medical ex-

penses paid by the Fund. In the context of this motion for summary judgment, that burden has not been met.

Unlike *McIntosh* and *Singleton*, the Plan here is not so broad in scope as to require reimbursement out of "any" amounts received. Instead, the Plan language here is closer to that in *O'Brien*, requiring reimbursement only if the insurer can show that the settlement proceeds constitute payment for the same money paid by the insurer for medical expenses. To prevail here, the moving parties must show the absence of any factual question as to the proper allocation of the settlement proceeds. This, neither the Fund nor the Vreelands can do. Accordingly, the court must deny the motions for summary judgment.

The court also denies the summary judgment motions because of questions of fact regarding the laches and estoppel defenses. Accepting Plaintiff's version of the facts may well lead to a finding that the Fund is limited to the reimbursement of $56,000. Because the Fund disputes the facts upon which Plaintiff's equitable defenses lie, such defenses cannot be decided at this juncture.

## CONCLUSION

For the foregoing reasons, the court denies the cross-motions for summary judgment. The Clerk of the Court is directed to terminate both motions.

SO ORDERED.